Statement of the case.

[No. 1570.]

PHILIP DAVIS *v.* THE STATE.

1. PRACTICE—EVIDENCE.—BILLS OF EXCEPTION to the rulings of the court below in admitting evidence for the State over objections by the defense must set forth the objections that were interposed; otherwise the action of the court below will not be revised.

2. SAME.—Inferences will not be indulged to supply omissions in bills of exceptions. Parties asserting the availability of supposed errors must make their bill of exceptions so full and certain in statement that, in and of itself, it will disclose all that is necessary to manifest the supposed error. The bill of exceptions in this case fails to disclose the relevancy and materiality of the proposed evidence which was excluded.

3. MURDER—CHARGE OF THE COURT.—It was not error to refuse a charge upon murder in the second degree when there was no evidence which tended to establish culpable homicide other than murder of the first degree.

4. SAME—PRACTICE.—In a prosecution for murder, the court failed to define murder of the second degree, but instructed the jury as to the punishment of murder of that degree. *Held*, that the evidence demanded no definition of murder in the second degree, and that, though the court should not have instructed as to the punishment of murder in the second degree, such action of the court cannot be revised when it was not excepted to at the time, but was first objected to in the motion for new trial, and when it does not appear that such error prejudiced the rights of the defendant.

5. SAME—ALIBI.—Unless requested so to do, the trial judge is not required to charge specially upon the defense of *alibi*. It is ordinarily a defense sufficiently embraced in the general charge that a defendant is presumed by the law to be innocent until his guilt is established by competent evidence, beyond a reasonable doubt. In view of the fact that the defendant neither requested a charge upon his defense of *alibi*, nor reserved exceptions to the omission by the trial court, the action of the court was not error.

6. SAME—FACT CASE.—See evidence *held*, though circumstantial, abundant to support a conviction for murder in the first degree.

APPEAL from the District Court of Gonzales. Tried below before the Hon. E. Lewis.

The indictment charged the appellant with the murder of Samuel McGlocklin, in Gonzales county, Texas, on the fourth day of March, 1883. The penalty imposed by a verdict of murder in the first degree was a life term in the penitentiary.

James Coker was the first witness for the State. He testified that he knew the defendant, and knew the deceased in his life time. The deceased and the defendant were brothers-in-law. The deceased died on the fourth day of March, 1883, from the effects of a gunshot wound. The witness was at the funeral of the deceased, but at no time saw the corpse. The deceased, defendant and the witness all lived in Gonzales county, and their houses stood, with respect to each other, about like the three extremes of a triangle. The house of the defendant, or rather that of his father, with whom he lived, was situated about three miles south of where the deceased lived. The deceased lived about a quarter of a mile east of Leesville, and about thirty or forty yards from the Gonzales and Leesville road. It stood in a field and fronted east. It contained but one main room, and a rear shed room. The homicide was committed one Sunday night, at the house of the deceased. The witness was there on the next Tuesday, and found two or three pools of blood in the house; also the print of a ball in the chimney breast log. The witness found the forty-five calibre ball here exhibited, under the bed, near where the corpse was found, three or four days after the killing occurred. The wife of the deceased was in Leesville at the time of the homicide.

Allen Tolley, J. J. Carpenter, Byrd Keith and W. H. Riley searched the neighborhood for evidences of the perpetrator of the crime, commencing on Monday morning, about twelve hours after the homicide was committed. The witness met the party named near the house of the deceased. They had struck and were following the trail of a horse which had traveled very rapidly. The party did not leave this trail (except for Monday night, taking it up again on Tuesday morning) until they had tracked it, step by step, at eleven o'clock on Tuesday morning, to the defendant's place of residence, and to within twenty steps of the lot where the tracks were obliterated by the tramping of other stock. This track was very easy to follow. It was a running track in open ground, and a slow one in brush or other obstruction. The right fore foot of the animal scooped in and cut the dirt bias at every jump. This track did not lead direct to the house of the defendant, but wound around in every direction and crossed itself before reaching home. A piece of saddle leather was found on the trail, but no leather was found to have been lost from the saddle ridden by the defendant on Sunday, Monday and Tuesday. The distance between the

houses of the deceased and the defendant was about three or three and a half miles, but this track, in going from the one house to the other, traversed in its meanderings fully ten miles, and went through a perfect wilderness in places. Wherever the country was open the track was running—wherever it was obstructed it was slow. It crossed several roads, and traveled in one or two for some distance before leaving them again. About a half mile before reaching defendant's house, the track struck the road, and was thenceforth a running track. The witness knew the defendant's mare very well, and knew that she made just such a track as this one. That mare was ridden by the defendant at the funeral, and was badly jaded. The hair had been knocked or scraped off her right shoulder and breast. The trail led through a thickly settled neighborhood. It led from the deceased's house to Dick Calloway's, thence to Byrd Keith's, thence to Copeland's, thence up the lane between Henry Carraway's and the Humble place, to Stringer's. Thence to Brelsford's, thence to Clark's, thence to Riley's and thence to Self's; thence by several other places to the creek, and thence south of the Ivey place to old man Davis's place. Except the Gonzales and Leesville roads, the roads traveled by the trail were well traveled neighborhood roads. The witness identified the plot exhibited indicating the route traveled.

The witness, proceeding with his testimony, stated that the defendant came to his house on Sunday evening, about an hour and a half before sunset, and inquired the way to James Smith's place. At this time he was riding a gray mare, and his hands and face were not scratched. About dusk he came back by the witness's house, in a lope, and, instead of taking the road leading to his home, which was the left hand, he took the right hand road, which forked about three or four hundred yards beyond the witness's house. The witness did not see either the gray mare or the defendant again until the next Tuesday, when he noticed the hair knocked off the mare's shoulder and breast, and the face and hands of the defendant scratched. The defendant also limped on his right leg at that time. In following the trail, it was found that the animal ridden had run over many saplings and bushes. On each of these bushes and saplings the pursuing party found gray hair which corresponded with the hair of the gray mare. In one place, where the animal passed between two saplings, gray hair was found on each, and one of them had been bruised, evidently with a horseman's stirrup. At

another place a patch of hair was found on a blackjack tree, at a height which corresponded with the bruised place on the defendant's mare's shoulder.

The night of Sunday, March 4, 1883, was a dark, cloudy night, with rain threatening. Up to last Christmas, the defendant had been out of the country for four or five years, but was thoroughly well acquainted with the country. He was riding the same gray mare both times he passed the witness's house on Sunday evening. When he passed at dusk, the witness was not nearer to him than twenty-five steps, but readily recognized him and the mare. On Tuesday the witness made an affidavit charging the defendant and George Ivey with the murder of the deceased, and on Friday made another charging the defendant, George Ivey and Mrs. McGlocklin. The defendant at the time of the murder was under indictment for cattle theft, but the witness did not know whether or not the deceased was a witness against him. The witness examined the gray mare on Tuesday, and found the wound in her breast such as could have been made by the snag on a tree on which gray hair was found, and over which the trail passed. The witness did not go into Davis's house, nor examine for a pistol, a gun, boots or clothing.

Allen Tulley and W. H. Riley, testifying for the State, gave in detail the same evidence as to following the trail, finding gray hairs, etc., as that given by the witness Coker, with the addition that, when they started on the trail, at the house of the deceased, about ten o'clock on Monday morning, they found the track of a fine boot, about a number five, leading to a crack in the northwest corner of the deceased's house, from where a horse had been tied at the fence, one hundred yards south of the house. From this crack they followed the trail of the boot track back to where the horse had been tied. Following the circuitous track of the horse from the fence to the defendant's house, they found where the rider had half dismounted, leaving the impression of one boot in the ground. This track corresponded with that found on the trail from the fence to the deceased's house. This single track was where the horse struck against a tree.

Each of these witnesses saw the defendant Monday morning —the morning following the killing. His face and hands were then scratched, the scratches being apparently six or eight hours old. The scratches were red and inflamed. When first seen after the murder, the defendant's gray mare was very much jaded and run down. The witnesses did not go into old man

Davis's house, nor did they look there for pistol, gun, boots or clothing. Both the defendant and his father came to the house of the deceased on the Monday morning after the killing, and the defendant remained there on Tuesday until arrested. He knew that the party were hunting on the trail, and knew it from the time they started on Monday morning. He assisted in looking about the trail around the house, but did not go with the party from the house, nor was he asked to go. The witness Tolley was the deputy sheriff in charge. No one went on the trail with him but those he summoned. This witness also testified that he heard the shot, between half past seven and eight o'clock, on Sunday night, and heard screaming at the deceased's house. He went over next morning about an hour by sun. He saw the mare on the Tuesday following, but noticed nothing particular about her. Nothing about the tracks were peculiar, except they were running tracks.

Johnny Coker testified, for the State, that he was at his father's house on Sunday evening, when the defendant passed the house before sundown, inquiring the way to James Smith's. He talked with the defendant, and knew that his face and hands were not scratched then. He was then riding a gray mare. He repassed the house on his return, about dark, and took the road leading to the deceased's, passing the road leading to his own house. He was then riding in a gallop. The witness saw the defendant next morning and his face was then scratched; one scratch over his forehead, one on his nose, and one on his ear. Witness saw the scratches on the mare on Wednesday; one was on her shoulder and one on her breast.

Alfred Smith, who lived about midway between the houses of the deceased and the defendant, testified that on Sunday evening, about three o'clock, he saw a man and woman, whom he took to be the defendant and his sister, Mrs. McGlocklin. They passed the house of the witness horseback, one of them riding a gray animal.

Frank Smith testified, for the State, that on Sunday evening the defendant, riding a gray mare, came to his house about an hour and a half by sun and remained until after supper. He left in a great hurry, saying that he must get home before it rained. This was about candle lighting time. The witness lived within a half mile of the witness Coker. The defendant then had no scratches on his hands or face. Witness saw him

next morning, and noticed fresh red scratches on his face and ear.

J. C. Nalte and James Webb testified, for the State, that they saw the defendant on Sunday, the day of the killing. He was riding a gray mare, and wore a number five or six fine Sunday boots. Neither his face nor hands were then scratched. There were scratches on both when the witnesses saw him on Tuesday, and the mare he rode on Sunday had marks or scratches on her fore parts.

Louis Teter and Jack Roland testified, for the State, that they saw the defendant on Sunday evening. He was then riding a gray mare, wore a fine pair of number five or six boots, and had no scratches on his face or hands. They saw him again on Monday morning. He then wore a different pair of boots, and his face and ear were scratched.

Robert Harold testified, for the State, that he lived within three quarters of a mile from where the deceased was killed, and got to the house about eleven o'clock that night. The body was lying on a quilt, near the door between the main room and the shed room. Most of the blood visible was on the floor near the chimney and rather behind the body. Witness remained at the house all night. Next morning he found where a horse had been tied to the fence, about one hundred and fifty yards south from the house. The fence appeared to have been pulled down, and the witness found the track of a small boot going from this part of the fence to the house. The horse's tracks, from where they led off from the fence, were large and easily followed, and showed plainly that the animal went off in a run. The ball that killed the deceased entered the rear of the head and nearly in the center, and came out near the roots of the hair in front. The deceased was dead when the witness reached the house.

The testimony of Thomas Harold, who, it is to be inferred, went with the last witness to the deceased's house, on the night of the killing, was essentially the same. The boot tracks were apparently made by a fine number six small heeled boot. The witness saw the defendant next day. His face and hands were then scratched, and he was wearing a coarse, heavy boot, about a number six in size.

J. W. Guthrie testified, for the State, that he lived about eight hundred yards from the place of the killing. Between seven and eight o'clock on Sunday night he heard a woman scream at the house of the deceased, and repaired thither immediately,

and found the deceased lying dead on a quilt, near the middle door. There was no blood of consequence on the quilt, but some two or three pools were about on the floor, some distance from the body. Mrs. McGlocklin and the two small children were the only parties at the house. The feet of deceased were lying towards and near the table, on which sat a small tubular lantern. One of the tubes of this lantern showed where it had been cut more than half in two by a ball from a gun or pistol. The deceased had been shot entirely through the head from behind. This witness described the tracks of both man and horse about the premises exactly as they were described by the other witnesses. Through the cracks in the house already mentioned one could see through the middle door to where the deceased was sitting when he was shot. The witness had a man to take a seat by the table, and sighted through the crack from where the number six boot track showed the assassin to have stood, and saw that the man shooting had a "dead rest," covering the deceased at not more than twelve or fourteen feet. Witness saw the defendant next morning. He rode a gray mare up to the house of the deceased. The animal was badly fagged, and showed that she had very recently had a terrible heat. A mark on the shoulder indicated that she had run against an obstruction—such as a limb. Some one remarked that they pulled a snag out of the wound. The face of the defendant showed scratches eight or ten hours old. The right hind foot of the gray mare turned out a little. The tracks from the fence, which were followed some distance by the witness early on Monday morning, were made by the gray mare.

George Ivey testified, for the State, that he lived with Henry Carraway, three miles from the deceased's house. Both the defendant and the deceased were brothers-in-law to the witness. Defendant and deceased appeared friendly when the witness last saw them together. Some ten days prior to the killing the witness heard the defendant say that his sister's way of living would have to change. He spoke of Mrs. McGlocklin, who was his sister. He did not say by whom or how the change would be wrought; nor did he say anything about how the deceased and his wife got along together. Mr. and Mrs. McGlocklin did not get along well together, but the witness knew nothing of any unfriendly feeling between the defendant and the deceased. The witness had frequently heard Mrs. McGlocklin say that the deceased would some time urinate in the wrong man's pocket.

The defendant told the witness that he had two pairs of boots, and the witness knew that the defendant owned a forty-five calibre white handled six shooter. The deceased and the witness were always friendly, and had never had a harsh word. Witness wore usually a number six shoe, but on the Sunday of the killing had on a pair of number five boots. He went to Frank Morey's early on that day, and did not get back until near night.

On cross-examination, the witness admitted that in the fall of 1882 he had a conversation with Rob. Harold, in which he said to Rob. Harold that he could get ahead of the deceased. He denied, however, that he said to Rob. Harold that he did get ahead of the deceased, and that Harold refused, without proof, to believe it, and asked how the witness had got ahead of deceased, and that witness replied that he would suffer his throat cut before he would tell how. He denied that at Phil. Bush's, on Christmas, 1882, he had hard words with the deeased. Upon these denials the witness was contradicted by Rob. Harold, when examined by the defendant.

This witness was asked if he did not, about three weeks before the killing, tell Jacob Brewer, at Brewer's house, that the deceased intended to stick a knife into him, the witness; that he, witness, had eavesdropped the deceased's house while the deceased was talking to his wife, and heard the deceased tell his wife that he intended to be friendly with the witness, and stick a knife in him. The witness denied that he confessed to eavesdropping, but admitted that he said to Brewer that he was riding by the deceased's house one night, and stopped to hear the conversation of the deceased and his wife, and heard the deceased make the statement referred to. He admitted that about three weeks before the killing he told Phil. Bush that the deceased had threatened his, witness's, life.

John and Mrs. John Phipps testified, for the State, that Mr. and Mrs. McGlocklin did not live happily together. They lived at the house of the witnesses a short time, about eighteen months before this trial. They had often heard Mrs. McGlocklin make threats against the life of the deceased. She said that she had often slept with a knife under her pillow, intending to kill the deceased. The witnesses had never heard the defendant threaten the deceased.

James Long and Sam Tolley testified, for the State, that they were at church in Leesville at the time of the killing, and

reached the deceased's house about ten o'clock, going thence, at the request of Mrs. McGlocklin, to the house of old man Davis, to take the news of the murder and ask the immediate presence of Mr. Davis and the defendant. They reached Davis's house about midnight, called, and were responded to by Mr. Davis, told the news, and asked for the defendant. Mr. Davis said that he did not know whether or not Phil., the defendant, was at home. Some one, Mrs. Davis, the witness thought, called out: "Yes, Phil. is here." Mr. Davis said that the horses had all been turned out, and could not be got up until morning. The witnesses returned to the deceased's house without any one from Davis's.

Mrs. S. J. Aldridge testified, for the State, that shortly before the killing she heard Mrs. McGlocklin say that she would have her husband put out of the way, or would put him out of the way, as soon as she got out of bed. The defendant was not then present, nor did the witness ever hear him threaten the deceased.

John Davis, the father of the defendant, testified in his behalf that he, the witness, went to bed about dark the night of the killing, as was his usual custom. He did not know at what hour the defendant retired. The defendant had a white handled pistol—the same seen by Bob Tolley on Tuesday—but it was not in a shooting condition. It hung on the head of the bed in the defendant's room, and was the only firearm on the place. It was so rusty it would not revolve. The witness had got up and was sitting smoking when the State's witnesses Long and Tolley reached the house. This was about twelve o'clock, and the witness had been up since about ten. The witness and the defendant did not go back with them on being told of the murder of the deceased, because the horses belonging to the place had been turned out.

Mrs. McGlocklin, the daughter of the witness and wife of the deceased, came to the witness's house on Saturday, the day before the murder, and stayed over night. On Sunday, after dinner, she started home, the defendant going with her, riding a gray horse. Witness did not see the defendant again until next morning. The defendant got the horses up at daylight on Monday, and he and the witness went to McGlocklin's house immediately after breakfast. There was then nothing unusual or unnatural about the gray mare. There were no hurts about her except sores made by the harness. The witness hauled cotton all of the summer to Gonzales with this mare, and her shoulders

were hurt by the rubbing of the collar. If there was any hard feeling between the defendant and the deceased at the time of the death of the latter, the witness did not know it. The defendant was at the house of the deceased on Monday, and knew of the trailing party—knew their movements until his arrest, and nothing occurred to prevent his escaping if he had so desired.

Mrs. John Davis, the mother of the defendant, testified that the defendant and Mrs. McGlocklin left her house about three o'clock on the Sunday of the killing, to go to McGlocklin's house. John Davis, the witness's husband, lay down about an hour after dark on that Sunday night, and had been in bed about an hour and a half when the witness heard the defendant come in and go to bed in the shed room. He was at home when Long and Tolley reached the house that night. He was told what they wanted, and said that his horse was out, and he could not get it. He did not get up or go out while Long and Tolley were at the house. John Davis got up that night and smoked his pipe. He said that the clock struck ten while he was up. The defendant had been at home in bed some time when John Davis got up. The witness did not know that the defendant had or did not have his pistol on Sunday, but on Monday morning the pistol was hanging on his bed, where the witness hung it three or four days before. It was the same seen by Tolley, and was the only weapon on the place.

Two witnesses testified that the witness Ivey arrived at Carraway's, where he lived, between sunset and dark on the fatal Sunday evening, and retired about nine or ten o'clock. One of these witnesses, who slept in the same room with Ivey, testified that the witness Ivey did not leave that room during the night after he went to bed.

The motion for new trial presented the questions involved in the rulings of this court.

*Fly & Davidson,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WILLSON, JUDGE. 1. Defendant's several bills of exception, taken to the rulings of the court in admitting evidence introduced by the State, do not set forth the objections, if any, that were made to the admissibility of the evidence in the court be-

low.   We are not, therefore, called upon or authorized to con-
sider and revise these rulings in the trial court.   In *Summers* v.
*The State,* 5 Texas Court of Appeals, 365, this court said:   "Ex-
ceptions to the admission of evidence on the trial, where no rea-
son is assigned for objecting to it, will not be sustained when
the evidence is obviously competent as tending to prove any
of the facts put in issue by the pleadings."   And again, in *Mayo*
v. *The State,* 7 Texas Court of Appeals, 342, it is said:   "Inas-
much as the judge cannot discuss or comment upon the proposed
evidence, but must simply decide upon the objections made to
it, it seems fair to infer that all objections intended to be relied
on must be clearly stated, so that he may act in reference to all,
and that a failure to assert any objection would be tantamount
to a waiver of all objections not affirmatively presented."   (See,
also, *King* v. *The State,* 13 Texas Ct. App., 277.)   Without inti-
mating any opinion as to the admissibility of this evidence, we
have only to say that the matter is not presented to us in such
manner as to authorize us to determine it.

2.   Defendant's bill of exception to the exclusion of the testi-
mony of the witness Davis fails to disclose such facts as exhibit
the relevancy and materiality of the proposed evidence.   In
*Walker* v. *The State,* 9 Texas Court of Appeals, 200, this court
said:   "Inferences cannot and will not be indulged to supply
omissions in bills of exception.   It is the duty of those seeking
to avail themselves of the supposed errors reserved to make the
bill so full and certain in its statements that, in and of itself, it
will disclose all that is necessary to manifest the supposed er-
ror."   We fail to perceive from this bill of exception the rele-
vancy and materiality of the rejected evidence, and therefore
cannot hold that the court erred in refusing to admit it.

3.   It is objected by defendant, to the charge of the court, that
it did not define murder in the second degree, but instructed the
jury as to the punishment for that offense.   There is nothing in
the evidence presented to us which called for, or which would
have warranted a charge upon murder in the second degree.   If
the homicide was committed by the defendant, then there can be
no doubt, from the evidence, as to its degree.   It was murder in
the first degree, and could have been nothing less.   There being
no facts in the case which would warrant a charge upon mur-
der in the second degree, it would have been error in the court
to have given such a charge.   It was error to charge the pun-
ishment of murder in the second degree, but this error was not

excepted to by the defendant at the time, but is presented for the first time in a motion for a new trial. This being the case, the inquiry with us is, was it calculated to injure the rights of the defendant? If it was, it would be error for which the conviction would be set aside; but if it be apparent that the defendant has not been prejudiced thereby, the judgment will not be disturbed because of it. (Code Crim. Proc., Art. 685; Clark's Crim. Law, p. 522, note 208.) It is clear to our minds that the error complained of was favorable to the defendant. It gave the jury the option of punishing him for murder in the second degree only, when, if guilty at all, he was guilty of murder in the first degree. It was not calculated in any way, or to any extent, to injure his rights, and is obviously not such an error as should cause us to set aside the conviction.

4. Another objection made to the charge is that it fails to instruct the jury as to the rules of law applicable to the defense of *alibi*. We are not aware of any statute or decision which requires the trial judge to instruct the jury specially upon this defense, when not requested to do so. It is sufficiently embraced, we think, in the general charge that the defendant is presumed by the law to be innocent until his guilt is established by competent evidence, beyond a reasonable doubt. This general charge was given by the court, and the charge was in all other essential respects full, clear and applicable to the facts of the case. If the defendant desired a special charge in relation to his defense of *alibi*, he should have requested the court to give such a charge; which he did not do, nor did he except at the time to the omission of the court to charge upon that subject. (*Deggs* v. *The State*, 7 Texas Ct. App., 359; *McGrew* v. *The State*, 10 Texas Ct. App., 539.)

5. It only remains for us to pass upon the sufficiency of the evidence to sustain the verdict of the jury. While the evidence is all circumstantial, we must say that to our minds it is irresistibly convincing of the guilt of the defendant. It is not necessary that we should recite or discuss the facts. They consist of a most extraordinary chain of circumstances connecting the defendant with the act of assassination, and fastening the crime upon him beyond all reasonable doubt. We think the verdict is amply sustained by the evidence.

There is no error in the judgment, and it is affirmed.

*Affirmed.*

Opinion delivered October 24, 1883.